FILED

08/09/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0521

DA 21-0521

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 157

PLANNED PARENTHOOD OF MONTANA,
and JOEY BANKS, M.D., on behalf of themselves
and their patients,

      Plaintiffs and Appellees,

   v.

STATE OF MONTANA, by and through AUSTIN
KNUDSEN, in his official capacity as Attorney General,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                In and For the County of Yellowstone, Cause No. DV 21-0999
                Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Austin Knudsen, Montana Attorney General, David M.S. Dewhirst,
           Solicitor General, Kathleen L. Smithgall, Brent Mead, Assistant
           Solicitors General, Helena, Montana

           Kevin H. Theriot, Denise M. Harle, Alliance Defending Freedom,
           Scottsdale, Arizona

      For Appellees:

           Raph Graybill, Graybill Law Firm, PC, Great Falls, Montana

           Gene R. Jarussi, Attorney at Law, Billings, Montana

           Alan E. Schoenfeld, Michelle Nicole Diamond, Wilmer Cutler Pickering
           Hale and Dorr LLP, New York, New York

           Kimberly Parker, Nicole Rabner, Wilmer Cutler Pickering Hale and Dorr
           LLP, Washington, District of Columbia

Hana Bajramovic, Planned Parenthood Federation of America, Inc., New York, New York

Alice Clapman, Planned Parenthood Federation of America, Inc., Washington, District of Columbia

For Amici ACLU of Montana, et al.:

Alex Rate, Akilah Lane, ACLU of Montana Foundation, Inc., Missoula Montana

Amy Myrick, Alexander Wilson, Astrid Ackerman, Center for Reproductive Rights, New York, New York

For Amici Montana Constitutional Convention Delegates and Research Staff:

Emily J. Cross, Kyle Anne Gray, Brianne C. McClafferty, Holland & Hart LLP, Billings, Montana

For Amici The Asian Pacific Institute on Gender-Based Violence, et al.:

Matthew Gordon, Perkins Coie LLP, Seattle, Washington

For Amici American College of Obstetricians and Gynecologists, et al.:

Lindsay C. Beck, Beck, Amsden & Stalpes pllc, Bozeman, Montana

Submitted on Briefs: May 11, 2022

Decided: August 8, 2022

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     The State appeals the District Court's grant of a preliminary injunction temporarily enjoining the implementation of three laws the 2021 Legislature enacted that regulate or restrict abortion services: House Bills (HB) 136, 171, and 140 (collectively, "the challenged laws"). Restated, the issues are:

1. *Did the District Court manifestly abuse its discretion in granting a preliminary injunction when it determined that the Plaintiffs made a prima facie showing that the challenged laws violate their rights under the Montana Constitution?*

2. *Did the District Court manifestly abuse its discretion in granting a preliminary injunction when it determined that the Plaintiffs would suffer irreparable injury if the challenged laws took effect?*

Applying our settled standards for review of preliminary injunctions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     During the 2021 session, the Montana Legislature passed HB 136, HB 171, HB 140, and HB 229. 2021 Mont. Laws 981-94, 1309-10. The Governor signed these bills into law in April 2021. In August 2021, the Plaintiffs, providers of abortion services (Providers), filed a complaint for declaratory and injunctive relief challenging all four laws.[1] They sought a preliminary injunction on the first three: HBs 136, 171, and 140.

¶3     HB 136 bans abortions beginning at twenty weeks from the patient's last menstrual period (LMP). HB 171 eliminates tele-health services for medication abortions and adds a variety of new credentialing, informed consent, and reporting requirements for abortion

---

[1] Providers filed this action on behalf of themselves and their patients. The State does not challenge Providers' standing in this appeal.

3

providers. HB 140 mandates that an abortion provider offer patients the opportunity to view an ultrasound and listen to the fetal heart tone. The challenged laws also provide for various criminal penalties and for civil remedies.

¶4 Providers challenged these laws as violating several rights guaranteed by the Montana Constitution, including the rights to privacy and equal protection. The State filed a brief opposing the preliminary injunction and submitted supporting declarations. In October 2021, following a show cause hearing and its consideration of each party's affidavits and declarations, the court granted a preliminary injunction, and this appeal followed.

## STANDARD OF REVIEW

¶5 We review the grant of a preliminary injunction to determine whether the district court manifestly abused its discretion. *Porter v. K & S P'ship*, 192 Mont. 175, 181, 627 P.2d 836, 839 (1981). A court abuses its discretion when it acts "arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re Marriage of Elder & Mahlum*, 2020 MT 91, ¶ 10, 399 Mont. 532, 462 P.3d 209 (citation omitted). An abuse of discretion rises to the level of "manifest" when it is "obvious, evident, or unmistakable." *Driscoll v. Stapleton*, 2020 MT 247, ¶ 12, 401 Mont. 405, 473 P.3d 386 (citations omitted). If the decision was based on legal conclusions, however, we review those conclusions de novo. *Driscoll*, ¶ 12. "[I]n considering whether to issue a preliminary injunction, neither the district court nor this Court will determine the underlying merits of the case giving rise to the preliminary injunction." *Driscoll*, ¶ 12 (citations and alterations omitted).

4

## DISCUSSION

¶6      A court may grant an injunction order on any one of five enumerated grounds, including as pertinent here:

> (1) when it appears that the applicant is entitled to the relief demanded and the relief or any part of the relief consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually; [or]

> (2) when it appears that the commission or continuance of some act during the litigation would produce a great or irreparable injury to the applicant[.]

Section 27-19-201(1)-(2), MCA. The subsections of § 27-19-201, MCA, are written disjunctively; therefore, "only one subsection need be met for an injunction to issue." *BAM Ventures, LLC v. Schifferman*, 2019 MT 67, ¶ 14, 395 Mont. 160, 437 P.3d 142 (citations omitted). To prevail under subsection (1), "an applicant must show that [the applicant] has a legitimate cause of action and that [the applicant] is likely to succeed on the merits of that claim . . . [and] that an injunction is an appropriate remedy." *Sandrock v. DeTienne*, 2010 MT 237, ¶ 16, 358 Mont. 175, 243 P.3d 1123 (citations omitted). To establish the first part of that test (a legitimate cause of action that is likely to succeed on the merits), the applicant must make at least "a prima facie showing" of entitlement to relief. *BAM Ventures*, ¶ 18; *Sandrock*, ¶ 16. But the applicant need not establish "evidence . . . sufficient to prevail at trial." *Driscoll*, ¶ 16. The second part of the test (that an injunction is an appropriate remedy) requires "the prevention of some degree of harm or injury." *BAM Ventures*, ¶ 16. Although only subsection (2) explicitly demands the appearance of "great or irreparable injury," we have stated that a "lesser degree of harm

5

[is] implied with the other subsections of § 27-19-201, MCA," as well. *BAM Ventures*, ¶ 16. This determination must be guided ultimately by the purpose of a preliminary injunction, which is "to maintain the status quo pending trial." *Sandrock*, ¶ 16. We have defined "status quo" as "the last actual, peaceable, noncontested condition which preceded the pending controversy." *Sandrock*, ¶ 16 (citations omitted). "For the purposes of a preliminary injunction, the loss of a constitutional right constitutes an irreparable injury." *Driscoll*, ¶ 15; *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 15, 366 Mont. 224, 286 P.3d 1161.

¶7 The District Court granted Providers' preliminary injunction motion on two alternate grounds. It found that Providers satisfied the requirements of subsection (1) because they made a prima facie case that the challenged laws deprived them of a constitutional right. It held also that Providers were entitled to injunctive relief under subsection (2) because the challenged laws, if not enjoined during the litigation, would cause Providers and their patients great or irreparable harm.

¶8     *1. Did the District Court manifestly abuse its discretion in granting a preliminary injunction when it determined that the Plaintiffs made a prima facie showing that the challenged laws violate their rights under the Montana Constitution?*

¶9 The State argues that the District Court's application of strict scrutiny was erroneous. It contends further that the court erred by applying an incorrect preliminary injunction standard because the standard should be "likelihood of success on the merits," not "prima facie." The State also claims that the District Court failed to consider and assess the State's rebuttal of Providers' prima facie case.

6

*The Challenged Laws and the District Court's Rulings*

    <u>HB 136</u>

¶10    HB 136, titled "Montana Pain-Capable Unborn Child Protection Act," bans abortions beginning at twenty weeks LMP. The asserted compelling state interest is "protecting the lives of unborn children from the stage at which substantial medical evidence indicates that they are capable of feeling pain."[2] HB 136, 67th Leg., Reg. Sess. (Mont. 2021). HB 136 prohibits abortions of "unborn child[ren] capable of feeling pain unless it is necessary to prevent a serious health risk to the unborn child's mother." Mont. HB 136, § 3(1)(a). HB 136 provides for civil damages and subjects abortion providers who violate Section 3 to "a felony punishable in accordance with" § 50-20-112, MCA. Mont. HB 136, §§ 4-5.

¶11    Providers argued that HB 136's ban on abortions for pregnancies within twenty weeks LMP violates their patients' right to privacy, under Article II, Section 10; right to individual dignity, under Article II, Section 4; right to seek safety, health, and happiness in all lawful ways, under Article II, Section 3; and right to equal protection, under Article II, Section 4, of the Montana Constitution. They argued also that the Bill is unconstitutionally vague because "the exceptions to the 20-week ban do not give a provider fair notice of when he or she would be subject to criminal liability." The State argued that the Montana

---

[2] Providers criticize the challenged laws for using inflammatory and medically inaccurate language, such as "unborn children," to further stigmatize abortion services. They contend also that the laws lack gender-inclusivity because people of other gender identities may become pregnant and seek abortion services. Although we use neutral terms where possible throughout the Opinion, when quoting directly from the legislative materials, we use the challenged laws' terms for clarity.

Constitution does not protect "late-term" abortions and that HB 136 should not be subject to strict scrutiny. Citing federal law, the State contended that HB 136 reasonably achieves the compelling interest of protecting against fetal pain and suffering. Based on the evidence the parties submitted, the District Court determined that Providers made a prima facie showing that HB 136 violates their patients' fundamental right to privacy by banning pre-viability abortions beginning at twenty weeks LMP.[3]

*HB 171*

¶12   HB 171 is titled the "Montana Abortion-Inducing Drug Risk Protocol Act." HB 171, 67th Leg., Reg. Sess. (Mont. 2021). Its asserted compelling state interest is "protecting the health and welfare of a woman considering an abortion" and "promoting the health and safety of women." Mont. HB 171, § 2(1), (6). It requires in-person examination by a qualified medical practitioner; prohibits providing "an abortion inducing drug via courier, delivery, or mail service"; requires that the provider be credentialed to identify and treat a variety of physiological and behavioral conditions and be able to provide surgical intervention or to contract with another qualified medical practitioner who can; requires (with narrow exception) the patient's "informed consent" at least twenty-four hours in advance on a form that includes, among other things, "information about the possibility of reversing the effects of the chemical abortion"; and imposes detailed requirements on medication abortion providers to report to the State each medication

___

[3] The court determined also that HB 136 prima facie violates Providers' patients' right to equal protection and Providers' and their patients' right to due process. The State does not contest those determinations on appeal.

8

abortion performed. The report must include, among other things, such information as "the pregnant woman's county, state, and country of residence; the pregnant woman's age and race; [and] the number of previous pregnancies, number of live births, and number of previous abortions of the pregnant woman[.]" Mont. HB 171, § 9(2).

¶13 HB 171 imposes felony criminal penalties and civil liability for violations of its provisions, including actual and punitive damages, professional disciplinary action, and recovery for the patient's survivors for the wrongful death of the patient. Mont. HB 171, §§ 11-12.

¶14 Providers argued that HB 171's examination and informed consent requirements violate their patients' right to privacy, under Article II, Section 10; right to individual dignity, under Article II, Section 4; right to seek safety, health, and happiness, under Article II, Section 3; and right to equal protection, under Article II, Section 4, by increasing the costs and burdens associated with obtaining a medication abortion. They contended also that the law's requirement to make "all reasonable efforts" to schedule follow-up appointments is unconstitutionally vague and that the informed consent provisions violate Providers' right to free speech, under Article II, Section 7, because they compel providers to distribute medical misinformation. Providers argued that the credentialing requirements are unconstitutionally vague and violate their patients' rights to privacy, individual dignity, equal protection, and the right to seek safety, health, and happiness by restricting access to pre-viability abortions. Providers also challenged HB 171's reporting requirements under the Montana Constitution's right to privacy, right to informational privacy, right to individual dignity, right to seek safety, health, and happiness, and right to equal protection.

9

¶15 The State argued that HB 171 is a reasonable informed-consent law. It disputed Providers' interpretation of the mandatory twenty-four-hour delay, and it contended that none of the required physician disclosures are "medically inaccurate." It asserted that HB 171's credentialing requirements survive constitutional scrutiny because they are reasonable restrictions on the practice of medicine and that the reporting requirements do not violate informational privacy because they do not disclose any patients' names.

¶16 The District Court concluded that Providers made a prima facie showing that HB 171 is unconstitutional. It determined, first, that Providers made a sufficient showing that HB 171's credentialing requirements expand existing legal restrictions on "who can perform a medication abortion." *See* § 50-20-109(1)(a), MCA. It concluded that Providers demonstrated that the examination requirements prima facie infringe on their patients' right to privacy by banning tele-health medication abortions, imposing a twenty-four-hour mandatory delay on all medication abortions, and requiring an additional in-person provider visit. The court further decided that Providers made a prima facie showing that the informed consent requirements violate their rights to free speech by compelling provider speech, and it concluded that the reporting requirements prima facie violate Providers' patients' right to privacy by publicizing identifiable patient information.

*HB 140*

¶17 HB 140, titled "An Act Requiring that a Pregnant Woman Must be Afforded the Opportunity to View an Active Ultrasound and Ultrasound Images and Listen to the Fetal Heart Tone of the Unborn Child Before Undergoing an Abortion," requires an abortion provider to inform the patient "of the opportunity to: (i) view an active ultrasound of the

10

unborn child; (ii) view an ultrasound image of the unborn child; and (iii) listen to the fetal heart tone of the unborn child, if audible." HB 140, § 1(1)(a), 67th Leg., Reg. Sess. (Mont. 2021).

¶18 Providers argued that HB 140 violates their patients' right to privacy under Article II, Section 10; right to individual dignity and equal protection, under Article II, Section 4; and right to seek safety, health, and happiness, under Article II, Section 3, by restricting access to abortion services. They contended also that the Bill violates Providers' right to free speech, under Article II, Section 7, because it compels Providers to make medically unnecessary disclosures and regulates Providers' speech on the basis of content. The State argued that HB 140 is not unconstitutional because it helps patients make better informed decisions before terminating their pregnancies. The District Court concluded that Providers made a prima facie showing that HB 140 violates the rights to privacy, dignity, and equal protection because the ultrasound and fetal heart tone requirements "serve to stigmatize or discourage" patients from obtaining an abortion in Montana.

*Application of Strict Scrutiny*

¶19 The State first argues that the District Court erroneously applied strict scrutiny because, although the proposed laws affect abortion, they do not restrict it. Stated differently at times, the State contends the challenged laws "implicate" fundamental rights but do not "infringe" upon them.

¶20 The court applied our precedent subjecting restrictions on abortion services to strict scrutiny because they interfere with the fundamental right to privacy. *See Armstrong v. State*, 1999 MT 261, ¶¶ 39-40, 296 Mont. 361, 989 P.2d 364. Concluding that Montana's

11

constitutional right to privacy "broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from government interference[,]" we held in *Armstrong* that "Article II, Section 10, protects the right to procreative autonomy[.]" *Armstrong*, ¶¶ 2, 14. *Armstrong* also held that any legislation that interferes with this right must be narrowly tailored to effectuate a compelling interest—"a medically acknowledged, *bonafide* health risk, clearly and convincingly demonstrated." *Armstrong*, ¶¶ 34, 62. The State asks this Court to overrule *Armstrong*. As we do not determine the ultimate merits of a case on appeal from a preliminary injunction, *Driscoll*, ¶ 12, we decline to overrule precedent in such an appeal, when the very purpose of a preliminary injunction is to maintain the status quo pending that final determination.[4] *See Sandrock*, ¶ 16. Because the District Court found that the challenged laws restrict access to abortion services, it applied strict scrutiny under *Armstrong*. The court followed our precedent and did not commit an error of law when it employed this standard. We proceed to consider the District Court's grant of a preliminary injunction under § 27-19-201(1) and (2), MCA.

---

[4] The State reiterated its argument in a Notice of Supplemental Authority, pursuant to M. R. App. P. 12(6), after the United States Supreme Court decided *Dobbs v. Jackson Women's Health Org.*, 597 U.S. ___, 142 S. Ct. 2228 (2022) (No. 19-1392). Rule 12(6) permits a party to file notice of supplemental authority "[w]hen pertinent and significant authorities come to the attention of a party after the party's brief has been filed." M. R. App. P. 12(6). The notice must "set[] forth the citation(s) without argument." M. R. App. P. 12(6). The State's notice includes substantial legal argument and thus violates this Rule. It is immaterial to the analysis here as we do not address the State's argument for overruling *Armstrong*.

***The Preliminary Injunction Standard***

¶21    Much of the State's argument on appeal turns on its contention that this Court must clarify the standards for a preliminary injunction because, according to the State, most courts, including the District Court in this case, "articulate[] the wrong standards," the result being "a muddled and eroded standard that produces on-demand injunctions of any challenged law."

¶22    The State argues that "entitle[ment] to relief" under § 27-19-201(1), MCA, by its plain language and statutory construction, requires more than a prima facie showing. The State contends that the prima facie standard first appeared, erroneously, in *Porter*, 192 Mont. at 181, 627 P.2d at 839, and that *Porter* did not cite to any authority for the rule. The State adds that the federal preliminary injunction standard requires a finding of "likelihood of success on the merits" and that Montana should adopt that standard not only for claims involving money damages but for constitutional claims as well. Providers argue that the District Court applied the correct standard, and, regardless, they can satisfy the "likelihood of success" standard as well.

¶23    Since at least as early as 1912, the Court has applied the prima facie standard to preliminary injunctions:

> It is not necessary that a case be made which would entitle the plaintiff to relief at all events on final hearing. If he has made out a *prima facie* case, or if upon the showing made it is left doubtful whether or not the plaintiff will suffer irreparable injury before his rights can be fully investigated and determined, the court ought to incline to issue the injunction and preserve the *status quo*.

13

*Rea Bros. Sheep Co. v. Rudi*, 46 Mont. 149, 160, 127 P. 85, 87 (1912) (emphasis in original); *see also Atkinson v. Roosevelt Cty.*, 66 Mont. 411, 425, 214 P. 74, 78 (1923); *Parsons v. Mussigbrod*, 59 Mont. 336, 341, 196 P. 528, 529 (1921). Earlier cases suggest that the Court employed a similar standard, although it did not explicitly frame it as a "prima facie" case. *See, e.g.*, *Campbell v. Flannery*, 29 Mont. 246, 248, 74 P. 450, 450-51 (1903) ("It is a fundamental principle of the law of injunctions that the plaintiff must show a clear right."); *Colusa Parrot Mining & Smelting Co. v. Barnard*, 28 Mont. 11, 18, 72 P. 45, 46 (1903) ("evidence sufficient to authorize a granting of a preliminary injunction or to warrant the refusal thereof may not be sufficient to maintain a like decision upon a final trial of the action on its merits"); *Bennett Bros. Co. v. Congdon*, 20 Mont. 208, 211-12, 50 P. 556, 557 (1897) ("the [preliminary injunction] rule presupposes a case properly presented to the court"). *Porter* was not the first case to apply the prima facie standard, and *Porter* did cite authority in support of the rule. *See Porter*, 192 Mont. at 181, 627 P.2d at 839 (citing *Atkinson*, 66 Mont. at 421, 214 P. at 76-77; *Parsons*, 59 Mont. at 340, 196 P. at 529; *Rea Bros. Sheep*, 46 Mont. at 160, 127 P. at 87). Recent cases have continued to require a prima facie showing. *See Driscoll*, ¶ 16; *Weems v. State*, 2019 MT 98, ¶ 18, 395 Mont. 350, 440 P.3d 4; *Mack v. Anderson*, 2016 MT 204, ¶ 15, 384 Mont. 368, 380 P.3d 730; *Sandrock*, ¶ 16; *Dreyer v. Bd. of Trs.*, 193 Mont. 95, 99, 630 P.2d 226, 228 (1981).

¶24 The State argues that the plain language of § 27-19-201(1), MCA, demands a standard higher than "prima facie" because subsection (1) states the applicant must show that the applicant "appears . . . entitled to the relief demanded." The State makes one

14

conclusory assertion that this language "plainly requires showing a likelihood of success, or something like it." Citing Black's Law Dictionary, the State attempts to distinguish the phrase "appears . . . entitled to the relief demanded" from "prima facie."

¶25 Black's Law Dictionary contains three definitions of "prima facie." The first, an 18th Century adjectival definition, states: "Sufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may later be proved to be untrue." *Prima facie*, *Black's Law Dictionary* (11th ed. 2019). The second, a 15th Century adverbial definition, states: "At first sight; on first appearance but subject to further evidence or information." *Prima facie*, *Black's Law Dictionary*, *supra*; *see also Weems*, ¶ 18 (applying this definition to our preliminary injunction standard). The third, a definition of "prima facie case," states: "1. The establishment of a legally required rebuttable presumption. 2. A party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Prima facie case*, *Black's Law Dictionary*, *supra*.

¶26 These definitions are consistent with our preliminary injunction precedents, which require a showing of entitlement to temporary relief but not ultimate success on final judgment. *See Driscoll*, ¶ 16. They comport also with the purpose of preliminary relief, which is to "preserve the status quo and minimize the harm to all parties pending final resolution on the merits." *See Driscoll*, ¶ 14. Finally, these definitions accord with the plain language of the statute, which states, "An injunction order may be granted . . . when it *appears* that the applicant is entitled to the relief demanded . . . ." *See* § 27-19-201(1), MCA (emphasis added).

15

¶27 The State presents no reasoned explanation why an appearance of "entitle[ment] to the relief demanded" somehow implies a more demanding burden than any of the prima facie definitions stated above. Though the State argues at length about the definition of "prima facie," it makes no argument—either structural, textual, or historical—regarding the meaning of the phrase, "appears . . . entitled to the relief demanded." It points us to no legislative materials, statutes, or cases that suggest the phrase should be interpreted as the State wants us to interpret it. "It is not the job of this Court . . . to guess at [a party's] precise position[] or to develop legal analysis that may lend support to that position." *Whitefish Credit Union v. Sherman*, 2012 MT 267, ¶ 16, 367 Mont. 103, 289 P.3d 174. Neither "appears . . . entitled to the relief demanded" nor "prima facie case" demands a showing of ultimate success on the merits. A party need not win its case to show that it may appear "entitled to relief"; yet that is exactly what the State asks us to hold. The State conspicuously argues that Providers should be required to prove that the challenged laws are unconstitutional at the preliminary injunction stage. There is no support in the plain reading of the statute or in any of our precedents for this interpretation.

¶28 The State advances one structural argument in support of its theory that the plain language of § 27-19-201(1), MCA, requires more than a "prima facie showing." If the standard is "prima facie," the State contends, it would be pointless to consider contrary evidence and argument at the show cause hearing, *see* § 27-19-301(2), MCA, and there would be no difference between the preliminary injunction standard and the requirements for obtaining an ex parte temporary restraining order (TRO), *see* § 27-19-315, MCA.

16

¶29	Section 27-19-301, MCA, requires notice to the nonmoving party. It states that a preliminary injunction may not issue "without reasonable notice to the adverse party of the time and place of the making of the application therefor." Section 27-19-301(1), MCA. "Before granting an injunction order, the court or judge shall make an order requiring cause to be shown, at a specific time and place, why the injunction should not be granted[.]" Section 27-19-301(2), MCA. The point of oppositional briefing, therefore, is to allow the nonmoving party an opportunity to show cause "why the injunction should not be granted." *See* § 27-19-301(2), MCA. It provides the nonmoving party an opportunity to argue that the movant did not meet its burden with respect to one of the subsections in § 27-19-201, MCA. The State had an opportunity to argue, and did argue, that Providers did not meet their burden of establishing a prima facie case at the show cause hearing. A TRO, by contrast, provides the movant with temporary relief without requiring notice and an opportunity to be heard. *See* § 27-19-315(1)-(2), MCA. "A restraining order is distinguishable from an injunction in that a restraining order is intended only as a restraint upon the defendant until the propriety of the granting of an injunction, temporary or perpetual, can be determined . . . ." *Wetzstein v. Bos. & Mont. Consol. Copper & Silver Mining Co.*, 25 Mont. 135, 136, 63 P. 1043, 1044 (1901). The State's argument that the prima facie standard renders meaningless the distinction between a preliminary injunction and a TRO, or their relevant procedural safeguards, is not persuasive.

¶30	The State contends that our precedents have "confused" the lower courts by framing the preliminary injunction standard, at times, as a "likelihood of success" standard and, at other times, as a "prima facie" standard. Review of the case law, however, proves this to

17

be incorrect. Repeatedly, we have stated that "likelihood of success" does not require the applicant to establish "entitlement to final judgment," "relief at all events on final hearing," "relief at a trial on the merits," or "evidence . . . sufficient to prevail at trial." *Driscoll*, ¶ 16; *Weems*, ¶ 18; *Mack*, ¶ 15; *M.H. v. Mont. High Sch. Ass'n*, 280 Mont. 123, 136, 929 P.2d 239, 247 (1996); *Porter*, 192 Mont. at 183, 627 P.2d at 840; *Parsons*, 59 Mont. at 341, 196 P. at 529; *Atkinson*, 66 Mont. at 422, 214 P. at 77; *Rea Bros. Sheep*, 46 Mont. at 159, 127 P. at 86-87; *Maloney v. King*, 25 Mont. 188, 192-93, 64 P. 351, 352 (1901). It requires instead that the applicant "demonstrate[] either a prima facie case that [it] will suffer some degree of harm and [is] entitled to relief (§ 27-19-201(1), MCA) or a prima facie case that [it] will suffer an 'irreparable injury[,' e.g.,] through the loss of a constitutional right (§ 27-19-201(2), MCA)." *Driscoll*, ¶ 17; *see also Mack*, ¶ 15 (citing *Sandrock*, ¶ 16; *Cole v. St. James Healthcare*, 2008 MT 453, ¶ 31, 348 Mont. 68, 199 P.3d 810).

¶31 The State observes correctly that we deviated from this test in *Van Loan v. Van Loan*, 271 Mont. 176, 895 P.2d 614 (1995). There, a survivor of childhood sexual abuse brought civil claims against his father, the perpetrator, for compensatory and punitive damages. *Van Loan*, 271 Mont. at 178, 895 P.2d at 615. The district court granted the plaintiff's application for a preliminary injunction to prevent the father from disbursing an estimated $1.5 million in IRA and investment account assets during the litigation. *Van Loan*, 271 Mont. at 178, 895 P.2d at 615. The issue we addressed on appeal was whether "a plaintiff in a tort action [may] obtain a preliminary injunction freezing a defendant's assets." *Van Loan*, 271 Mont. at 179, 895 P.2d at 615. This being an issue of

first impression, we looked to federal law for guidance. *Van Loan*, 271 Mont. at 179, 895 P.2d at 615. We noted two competing interests in such cases: (1) the protection of the moving party when, due to the nonmovant's impending insolvency, money damages will be an inadequate remedy, against (2) the need to keep the nonmoving party's assets free from unnecessary encumbrances. *Van Loan*, 271 Mont. at 182, 895 P.2d at 617. We therefore adopted a four-element test from federal case law for a limited purpose: "to determine whether a preliminary injunction should issue when a party's monetary judgment may be made ineffectual by actions of the adverse party thereby irreparably injuring the applicant." *Van Loan*, 271 Mont. at 182, 895 P.2d at 617-18. This test requires the applicant for a preliminary injunction in such cases to establish: (1) the likelihood that the movant will succeed on the merits of the action; (2) the likelihood of irreparable injury absent the issuance of the preliminary injunction; (3) that the threatened injury to the movant outweighs the damage the preliminary injunction may cause the opposing party; and (4) that the injunction would not be adverse to public policy. *Van Loan*, 271 Mont. at 182, 895 P.2d at 617. In conclusion, we reiterated that "the above four-part test[] appl[ies] only in cases where a party seeking money damages alleges that the defendant is hiding or dissipating his/her assets in such a manner that a money judgment will be ineffectual and/or the plaintiff will be irreparably injured." *Van Loan*, 271 Mont. at 184-85, 895 P.2d at 619.

¶32    The State asks us to extend the *Van Loan* test to all preliminary injunction motions, alleging that there is "no principled reason" to confine application of the test to situations where a plaintiff seeking only a legal remedy (i.e., money damages) attempts to freeze a defendant's assets during the pendency of the action. We noted in *Van Loan* the

"extraordinary" nature of such relief, and we highlighted the need to protect the defendant's assets from unwarranted encumbrances. *Van Loan*, 271 Mont. at 180, 182, 895 P.2d at 616-17 (quoting *In re Estate of Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994)). The Ninth Circuit Court of Appeals explained that the special treatment of such cases avoids the concern of "the sweeping effect that a plaintiff in any action requesting damages can apply for an injunction to sequester his or her opponent's assets." *In re Estate of Marcos*, 25 F.3d at 1480.

¶33 The State cites no authority to contradict our reasoning in *Van Loan*. It maintains, however, that because statutes enjoy a "presumption of constitutionality," *see Mont. Auto. Ass'n v. Greely*, 193 Mont. 378, 382, 632 P.2d 300, 303 (1981), they should enjoy heightened protection from preliminary injunctions. We addressed this reasoning, head-on, in *Driscoll*:

> A statute enjoys a presumption of constitutionality. Because a preliminary injunction does not decide the ultimate merits of a case, however, a party need establish only a prima facie violation of its rights to be entitled to a preliminary injunction—even if such evidence ultimately may not be sufficient to prevail at trial.

*Driscoll*, ¶ 16 (citations omitted). A party's burden to overcome a presumption of constitutionality to succeed in abrogating an act of the Legislature does not subject the party to a burden different from other parties who seek preliminary injunctions. "The presumption is for constitutionality. No statute will be *held* unconstitutional unless its violation of the fundamental law is clear and palpable." *Harrison v. Missoula*, 146 Mont. 420, 425, 407 P.2d 703, 706 (1965) (emphasis added). A preliminary injunction, or the affirmation thereof on appeal, that temporarily enjoins a statute is not

20

equivalent to a "holding" that the statute is unconstitutional. Our case law expressly prohibits courts from determining, on preliminary injunction, "the underlying merits of the case." *Driscoll*, ¶ 12. The presumption of constitutionality, therefore, does not alter the movant's burden to present a prima facie case at the preliminary injunction stage.

¶34 The State maintains that the Court extended the application of the *Van Loan* test in *M.H.*, 280 Mont. 123, 929 P.2d 239. At issue in *M.H.* was the constitutionality of two Montana High School Association (MHSA) bylaws regarding contest and interscholastic athletic competition participation: (1) the "age rule," excluding students nineteen or older; and (2) the "special education" rule, providing an exception to the age rule for students enrolled in a program of special education. *M.H.*, 280 Mont. at 127, 929 P.2d at 242. M.H., a nineteen-year-old high school student, obtained a preliminary injunction enjoining MHSA from enforcing the age rule on the ground that the bylaws violated M.H.'s right to due process. *M.H.*, 280 Mont. at 127-28, 929 P.2d at 242-43. We reversed the district court's preliminary injunction order because we held that the court erred in its conclusion that M.H. had a federally protected right to participate in interscholastic sports. *M.H.*, 280 Mont. at 135-36, 929 P.2d at 247-48. Because the district court erred in concluding that M.H. had a federally protected right to participate in interscholastic sports, M.H. could not establish a prima facie case that would entitle him to preliminary relief. *M.H.*, 280 Mont. at 136, 929 P.2d at 247-48. We did not apply the four-element test from *Van Loan* in *M.H.*, nor did we apply a more stringent preliminary injunction standard. We stated repeatedly that an applicant for a preliminary injunction must establish either "a prima facie case" or "irreparable injury." *See M.H.*, 280 Mont. at 129, 136,

21

929 P.2d at 243, 247. The plaintiff had no legal remedy; he could not show, therefore, that he was "entitled to the relief demanded" because he could not make a prima facie showing of a constitutional violation.

¶35 The State quotes selectively from *M.H.* to argue that we adopted a heightened preliminary injunction standard:

> The two statutory bases for granting a preliminary injunction at issue here— namely, the "likelihood of success on merits" basis and the "irreparable injury" basis . . . are not unrelated. . . . Thus, the irreparable injury basis . . . is based on an implicit determination that the applicant is likely to succeed on his or her underlying claim[.]

*See M.H.*, 280 Mont. at 135, 929 P.2d at 247 (citations omitted). We explained, however:

> [T]he [d]istrict [c]ourt's implicit conclusion that M.H. would likely succeed on the merits of his underlying § 504 claim was erroneous. We previously have indicated that an applicant for a preliminary injunction need not make a case that would entitle him or her to relief at a trial on the merits; an applicant must prove only a probable right and a probable danger that such right will be denied absent injunctive relief. Indeed, we consistently have held that district courts cannot issue preliminary injunctions absent the applicant establishing a prima facie case on the underlying claim or, based on the showing made, that it is at least doubtful whether or not the applicant will suffer irreparable injury before adjudication of his or her rights.

*M.H.*, 280 Mont. at 136, 929 P.2d at 247 (citations omitted). *M.H.* does not demonstrate that we have applied the "likelihood of success" standard as something more stringent than the "prima facie" standard. We said there, consistent with our case law, that a "likelihood of success on the merits" does not mean "a case that would entitle [one] to relief at a trial on the merits." *M.H.*, 280 Mont. at 136, 929 P.2d at 247. It requires merely a "prima facie case on the underlying claim." *M.H.*, 280 Mont. at 136, 929 P.2d at 247.

22

¶36    Finally, the State argues that we should adopt the federal test for preliminary injunctions.    The State again overstates the distinction between "prima facie" and "likelihood of success" by presenting the federal standard as more rigid than it actually is and the Montana standard as more forgiving.    We fail to see a meaningful difference between the two.    Nor does this Court follow or apply the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81.").    The State cites Wright and Miller's *Federal Practice & Procedure*.    But this treatise does not support the State's position because even Wright and Miller recognize that

> [t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a reasonable probability of success. *But the verbal differences do not seem to reflect substantive disagreement.    All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning.*

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2948.3, 197-201 (4th ed. 2022) (emphasis added).

¶37    In Montana, preliminary injunctions are governed by a statutory standard, which we have explained and interpreted consistently.    The State has not convinced us that our interpretation of § 27-19-201(1), MCA, is incorrect, and we conclude that the District Court applied the correct preliminary injunction standard.[5]    Having found that the District Court

---

[5] We find no support for the State's baseless assertion that our preliminary injunction standard has resulted in "on-demand preliminary injunctions."    Our decisions affirming denials of preliminary injunctions show that the district courts are not issuing them "on demand."    *See, e.g.*, *Benefis Healthcare v. Great Falls Clinic, LLP*, 2006 MT 254, ¶ 1, 334 Mont. 86, 146 P.3d 714; *Yockey v. Kearns Props., LLC*, 2005 MT 27, ¶ 21, 326 Mont. 28, 106 P.3d 1185; *Valley Christian Sch. v.*

did not commit an error of law in its application of either the proper tier of constitutional scrutiny or the preliminary injunction standard, we consider whether the District Court manifestly abused its discretion in enjoining the implementation of the challenged laws.

*HB 136*

¶38   The State argues on appeal that HB 136 is not a pre-viability law because viability can begin as early as twenty-one weeks. Alternatively, it contends, the law is narrowly tailored to achieve the compelling state interest of protecting against fetal pain.

¶39   The State's and Providers' experts agreed that viability cannot occur as early as twenty weeks. The State submitted declarations from several experts. The District Court found that, although the State's experts disagreed about the viability timeline, none of them opined that viability begins before twenty-one weeks LMP. Indeed, all experts in the case, including the State's experts, agreed that viability could not occur as early as twenty weeks LMP.

---

*Mont. High Sch. Ass'n*, 2004 MT 41, ¶ 1, 320 Mont. 81, 86 P.3d 554; *Am. Music Co. v. Higbee*, 1998 MT 150, ¶ 1, 324 Mont. 348, 961 P.2d 109; *Dicken v. Shaw*, 255 Mont. 231, 232-33, 841 P.2d 1126, 1127-28 (1992); *New Club Carlin v. Billings*, 237 Mont. 194, 196-97, 772 P.2d 303, 305 (1989); *Whistler v. Burlington N. R.R.*, 228 Mont. 150, 151, 741 P.2d 422, 423 (1987); *Warwood v. Hubbard*, 218 Mont. 438, 439, 709 P.2d 637, 638 (1985); *Smith v. Ravalli Cty. Bd. of Health*, 209 Mont. 292, 293, 679 P.2d 1249, 1250 (1984) (each one affirming the denial of a preliminary injunction). Nor are we reluctant to reverse a preliminary injunction if the standard is not met. *See, e.g.*, *Driscoll*, ¶ 1; *Simpkins v. Speck*, 2019 MT 120, ¶ 22, 395 Mont. 509, 443 P.3d 428; *Citizens for Balanced Use v. Maurier*, 2013 MT 166, ¶¶ 31-32, 370 Mont. 410, 303 P.3d 794; *Caldwell v. Sabo*, 2013 MT 240, ¶ 1, 371 Mont. 328, 308 P.3d 81; *State v. BNSF Ry. Co.*, 2011 MT 108, ¶ 25, 360 Mont. 361, 254 P.3d 561; *Access Organics, Inc. v. Hernandez*, 2008 MT 4, ¶ 1, 341 Mont. 73, 175 P.3d 899; *Mustang Holdings, LLC v. Zaveta*, 2006 MT 234, ¶ 18, 333 Mont. 471, 143 P.3d 456; *Snavely v. St. John*, 2006 MT 175, ¶ 1, 333 Mont. 16, 140 P.3d 492; *First Interst. Bank of Commerce v. Ward*, 282 Mont. 266, 267, 937 P.2d 470, 470 (1997); *M.H.*, 280 Mont. at 125, 929 P.2d at 241; *J.M. v. Mont. High Sch. Ass'n*, 265 Mont. 230, 232, 875 P.2d 1026, 1027 (1994); *Cornwall v. State*, 231 Mont. 58, 67, 752 P.2d 135, 140 (1988) (each one reversing the grant of a preliminary injunction).

¶40 The experts disagreed about whether HB 136 could prevent fetal pain—the State's asserted compelling interest. The State submitted expert affidavits opining that fetal pain begins "much earlier than many realize" and that fetal pain begins "well below 20 weeks gestation." Providers submitted a rebuttal expert affidavit stating in part that the consensus in the medical community is that it is impossible for a fetus to experience pain before at least twenty-four weeks LMP.

¶41 The State contends that the District Court did not consider its rebuttal evidence or its argument that HB 136 is "a reasonable and constitutional regulation." The court's findings, however, demonstrate that it considered the parties' conflicting evidence regarding the experience of fetal pain—the State's asserted compelling interest—and determined that Providers made a prima facie case that HB 136 failed strict scrutiny. "It is not this Court's function to reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court." *In re Marriage of Williams*, 2018 MT 221, ¶ 23, 392 Mont. 484, 425 P.3d 1277. The show cause hearing, moreover, did not provide an opportunity for testimony or cross-examination of the parties' witnesses. Beyond the parties' arguments, the court had only the experts' affidavits and declarations to consider. A final resolution of the experts' conflicting opinions and determination whether the law impermissibly infringes the fundamental right to privacy must be reserved for trial on the merits.

¶42 The District Court determined that "the State did not argue why [HB 136] would hold up under a strict scrutiny analysis." Indeed, nowhere in its brief to the District Court did the State engage with Providers' strict scrutiny argument. It rejected the premise that

25

strict scrutiny applies, and it argued instead that the law is a "reasonable" restriction on late-term abortion. The State mentioned in passing, for the first time at the show cause hearing, that HB 136 was tailored to "disallowing . . . abortion after pain capability." This was the State's only reference to a strict scrutiny standard, and it depended entirely on the credibility of its expert witnesses' opinions regarding fetal pain. The District Court appears to have rejected this premise, finding that "HB 136 . . . is likely unconstitutional."

¶43 The District Court considered the parties' evidentiary submissions, applied *Armstrong*'s strict scrutiny standard, and concluded that Providers made a sufficient showing that HB 136 is prima facie unconstitutional and should temporarily be enjoined pending trial. For preliminary injunction review, the record contains adequate scientific support from Providers' experts to sustain the District Court's findings and conclusions. We do not find a manifest abuse of discretion in the court's analysis.

*HB 171*

¶44 The State points to several alleged errors in the District Court's treatment of HB 171. It asserts, first, that the credentialing requirements are reasonable and "simply require[] the provider to be able to treat or refer for treatment patients experiencing complications while and immediately after the drugs are terminating their pregnancies." The State made the same argument in the District Court, and the court rejected it. Providers' expert opined that no single provider could be credentialed in handling all the purported complications HB 171 identifies, and the District Court appears to have found that opinion credible. The State's argument thus raises a question of credibility that goes to the ultimate merits and must await trial.

26

¶45    The State next argues that the informed consent requirements are not unconstitutional because they are reasonable and already exist in other forms.  It maintains that the ban on tele-health services protects patients' health and welfare and already is required by other statutes. The State analogizes HB 171's examination requirements to breast cancer treatment, care for terminal illnesses, and the prescription of Schedule II drugs.[6]

¶46    The District Court considered the State's informed consent argument but concluded that the twenty-four-hour mandatory delay prima facie prohibits a person from exercising a fundamental right for twenty-four hours.  The court also determined, relying on Providers' expert, that the health risks of medication abortions are "similar in magnitude to the risks of taking commonly prescribed and over-the-counter medications," concluding that the State's interest does not justify HB 171's level of intrusion.  The court weighed the parties' evidence and concluded that Providers made a prima facie showing that the examination and informed consent requirements were not narrowly tailored to a compelling state interest.

¶47    The State relies on *Planned Parenthood v. Casey*, in which the United States Supreme Court upheld a 24-hour "informed consent" requirement after concluding that it did not constitute an "undue burden" on the federal right to privacy under the Due Process

---

[6] This last argument needs little discussion.  The State simply cites to definitions of "written informed consent" for other specific treatments—which say nothing about in-person examinations or mandatory twenty-four-hour delays.  And its reference to an administrative rule requiring an in-person examination prior to the prescription of a Schedule II drug is inapt because abortion medication is not a "dangerous drug" classified as a Schedule II substance.

Clause of the Fourteenth Amendment. 505 U.S. 833, 887, 112 S. Ct. 2791, 2825-56 (1992). Providers' claims are brought under the Montana Constitution, however, and the District Court accordingly applied our holding that the "undue burden" test is not the standard in our courts, given the Montana Constitution's more robust protections. *See Armstrong*, ¶¶ 40-41.

¶48 The District Court also rejected the State's assertion that compelled speech is not unconstitutional in this context because it is part of the informed consent process. It held that the information regarding "abortion pill reversal" is not medically sound and that requiring providers to discuss abortion pill reversal regulates the content of their speech. It noted that even the State's experts agreed that abortion reversal medication is "experimental" in nature. The court thus concluded that Providers made a prima facie showing that the informed consent requirements impermissibly regulate content under Article II, Section 7, of the Montana Constitution. *See Denke v. Shoemaker*, 2008 MT 418, ¶ 47, 347 Mont. 322, 198 P.3d 284 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").

¶49 Relying on its expert's declaration, the State insists on appeal that abortion pill reversal is a legitimate treatment for reversing the effects of a medication abortion. Providers' expert disagreed, stating that she is "aware of no evidence that supports the theory underlying so-called medication abortion 'reversal.'" Though the experts disagree regarding the safety and efficacy of abortion "reversal," they seemingly agree that it is not widely accepted by the medical community—although the State's expert attributes this to an abortion "bias" within the medical community. To the extent there is a genuine conflict

28

of opinion between the parties' experts, it raises only a factual dispute to be resolved by the trier of fact on the ultimate merits of the case and thus is not proper for resolution on preliminary injunction.

¶50 The State raises another factual dispute, this time regarding HB 171's reporting requirements. It submits that, because the reporting requirements do not compel publication of patients' names and social security numbers, the bill does not require providers to disseminate personal information. The District Court rejected this contention because patients of certain demographics easily may be identified in rural Montana communities, even by the limited data required under HB 171 (e.g., the county of residence, the patient's age and race, the cost of the treatment, preexisting conditions, and the number of previous pregnancies). The State offers no argument for why the District Court's reasoning regarding the reporting of such detailed and unique personal information is faulty.[7]

¶51 Having reviewed each requirement of HB 171, the evidence submitted by the parties, and their respective arguments, the District Court enjoined HB 171 on the prima facie basis that it violates Providers' and their patients' constitutionally protected rights. The court applied the standards of law this Court has articulated, and its resolution of conflicts in the evidence finds support in the preliminary injunction record. We cannot conclude that the court "manifest[ly]" acted "arbitrarily, without employment of

[7] The State also challenges the District Court's conclusion that Providers made a prima facie case that HB 171's criminal and civil penalties are unconstitutionally vague. Because the penalties section of HB 171 depends on the validity of the bill's other provisions, we need not address this argument here.

conscientious judgment, or exceed[ed] the bounds of reason resulting in substantial injustice." *See Driscoll*, ¶ 12; *Marriage of Elder*, ¶ 10.

*HB 140*

¶52 Regarding HB 140, the State does not make any legal argument. It contends that HB 140 is an informed consent law, that other states have adopted similar laws, and that the District Court's analysis was "speculative."

¶53 Providers submitted expert affidavit testimony, however, explaining that the requirement to offer patients the opportunity to view an ultrasound is medically unnecessary. The expert opined that the intent of the law appears to be "only to shame the patient" for the patient's decision to seek an abortion.

¶54 Relying on this evidence and on *Armstrong*'s discussion of personal autonomy privacy, *see Armstrong*, ¶ 38, the District Court concluded that Providers made a prima facie showing that HB 140 violates the right to privacy because the ultrasound and fetal heart tone requirements "serve[] to stigmatize or discourage women from obtaining an abortion in Montana—a constitutionally protected right." The court concluded further that Providers made a prima facie case that HB 140's requirements violate the right to equal protection and individual dignity.

¶55 The State simply repeats its contention that HB 140 is nothing more than an "informed consent" law. It does not address the District Court's findings that the requirement serves no medical purpose and functions merely to discourage patients from obtaining abortions. The District Court concluded on this basis that Providers made a prima facie showing that HB 140 is not narrowly tailored to achieve that purpose. There

30

is testimony in the record to support this finding, and the court's reasoning shows no manifest abuse of discretion.

¶56 The District Court found that the challenged laws restrict abortion because they ban certain pre-viability abortions, they restrict access to medication abortions, and they stigmatize and deter patients from seeking out abortion services. Based on its application of our existing precedent and the record before it, we conclude that the District Court did not commit an error of law or manifestly abuse its discretion in concluding that Providers made a prima facie showing that the challenged laws are unconstitutional.

¶57 2. *Did the District Court manifestly abuse its discretion in granting a preliminary injunction on the ground that Providers would suffer irreparable injury if the challenged laws took effect?*

¶58 The State argues that the District Court applied an incorrect preliminary injunction standard under § 27-19-201(2), MCA, because a finding of "irreparable injury" is premised first on the existence of a "probable right and a probable danger that such right will be denied." *See M.H.*, 280 Mont. at 135, 929 P.2d at 247. The State also makes a passing contention that the District Court confused the requirements of subsection (1) with subsection (2). The State does not argue that the court's application of subsection (2) was incorrect, only that it employed an incorrect standard. "It is not the job of this Court . . . to guess at [a party's] precise position[] or to develop legal analysis that may lend support to that position." *Whitefish Credit Union*, ¶ 16. We therefore address only whether the District Court applied the correct preliminary injunction standard.

¶59 Section 27-19-201(2), MCA, permits the entry of a preliminary injunction when "it appears that the commission or continuance of some act during the litigation would produce

31

a great or irreparable injury to the applicant." We have stated that an "injury" is "any wrong or damage done to another, either in his person, rights, reputation, or property." *M.H.*, 280 Mont. at 135, 929 P.2d at 247 (citing *Injury*, *Black's Law Dictionary* (4ᵗʰ ed. 1968)). As we explained above, we have never required anything more than a prima facie showing to satisfy the statutory requirements. *See Driscoll*, ¶ 16; *BAM Ventures*, ¶ 18; *Sandrock*, ¶ 16; *Mack*, ¶ 15; *M.H.*, 280 Mont. at 135-36, 929 P.2d at 247-48; *Porter*, 192 Mont. at 183, 627 P.2d at 840. We thus "will affirm the preliminary injunction if the record shows that [Providers] demonstrated either a prima facie case that they will suffer some degree of harm and are entitled to relief (§ 27-19-201(1), MCA) or a prima facie case that they will suffer an 'irreparable injury' through the loss of a constitutional right (§ 27-19-201(2), MCA)." *Driscoll*, ¶ 17; s*ee also Weems*, ¶ 25 (recognizing that harm from an infringement of the right to privacy is adequate to justify a preliminary injunction); *Mont. Cannabis Indus. Ass'n*, ¶ 5 (recognizing irreparable injury from loss of constitutional right).

¶60 The District Court thoroughly analyzed the requirements of § 27-19-201(2), MCA, starting first with the rule from *Driscoll* and *Montana Cannabis Industry Association* that the loss of a constitutional right constitutes irreparable harm. It then found by substantial credible evidence that if the challenged laws were to take effect, they would interfere with the right to obtain a pre-viability abortion. It went on to discuss each bill specifically and concluded that Providers made a prima facie case that "the laws are incompatible with the Montana Constitution" and therefore give rise to constitutional injuries. The District Court did not manifestly abuse its discretion in applying § 27-19-201(2), MCA.

32

**CONCLUSION**

¶61 The District Court granted a preliminary injunction on two distinct grounds, either of which would have been sufficient to justify the preliminary relief. Having found no error of law or manifest abuse of discretion, we affirm the District Court's preliminary injunction order on both alternate grounds. The case will proceed to trial and await the District Court's decision on the ultimate merits of Providers' claims.

/S/ BETH BAKER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE